UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | | |
|---|---|---|---|
| KEVIN SMITH, | ) | | |
| | ) | | |
| Plaintiff, | ) | | |
| | ) | | |
| v. | ) | No. 1:21-cv-00373-JMS-CSW | |
| | ) | | |
| PRICE, | ) | | |
| RYLEDGE, | ) | | |
| LAMB, | ) | | |
| | ) | | |
| Defendants. | ) | | |

**ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff Kevin Smith, an Indiana Department of Correction (IDOC) inmate, filed this action under 42 U.S.C. § 1983 based on allegations that defendants Officers Price, Rilenge,[1] and Lamb violated his constitutional rights during vehicle transports between Wabash Valley Correctional Facility (Wabash Valley) and an outside hospital where Mr. Smith was taken for medical treatment. Dkt. 21. Mr. Smith's Eighth Amendment conditions of confinement claims proceed against defendants, along with his First Amendment retaliation claims. *Id.* Defendants move for summary judgment in their favor. Dkt. 116.

The Court appointed recruited counsel[2] for Mr. Smith to file a response in opposition to defendants' dispositive motion and through final resolution of this action. Recruited counsel timely filed plaintiff's response, dkt. 126, and defendants filed their reply, dkt. 128. This matter is now

---

[1] **The clerk is directed to update the docket** to reflect the correct spelling of defendant's name is Officer "Rilenge."

[2] The Court appreciates recruited counsel's efforts in assisting Mr. Smith with briefing summary judgment.

ripe for the Court's resolution. For the reasons explained below, defendants' motion for summary judgment, dkt. [116], is **GRANTED in part and DENIED in part**.

## I.
## Standard of Review

Parties in a civil dispute may move for summary judgment, which is a way to resolve a case short of a trial. *See* Fed. R. Civ. P. 56(a). Summary judgment is appropriate when there is no genuine dispute over any of the material facts, and the moving party is entitled to judgment as a matter of law. *Id.*; *Pack v. Middlebury Comm. Sch.*, 990 F.3d 1013, 1017 (7th Cir. 2021). A "genuine dispute" exists when a reasonable factfinder could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those that might affect the outcome of the suit. *Id.*

When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572-73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court need only consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour every inch of the record" for evidence that could be relevant. *Grant v. Tr. of Ind. Univ.*, 870 F.3d 562, 573-74 (7th Cir. 2017).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "[T]he burden on the moving party may be discharged by

'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

## II.
## Factual Background

The following statement of facts was evaluated under the standard set forth above. That is, this statement of facts is not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to the non-moving party. *See Reaves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

### A. The Parties and Mr. Smith's Medical Background

Mr. Smith is an IDOC inmate, and he was housed at Wabash Valley at all relevant times. Dkt. 127-1 at 11 (plaintiff's deposition). In September 1998, before his incarceration, Mr. Smith was shot nine times, his elbow was shattered, and he was left with a 90-degree bend and only 10-degree range of motion. *Id.* at 12, 14. In March 2019, during Mr. Smith's incarceration, an outside specialist performed reconstructive surgery on his elbow in an effort to improve his range of motion. *Id.* at 14-15; *see also* dkt. 127-2 at 4 (plaintiff's medical records). Mr. Smith now has an external fixator system surgically implanted in his arm. *Id.* at 18.[3]

After surgery, Mr. Smith needed follow-up care from the specialist which required transports from Wabash Valley to the hospital in June 2019—these vehicle transports are the subject of Mr. Smith's claims. *Id.* at 44; *see also* dkt. 21 (screening order).

___

[3] Mr. Smith described the external fixator system in his deposition: "Well, there's four surgically implanted rods, two in my lower arm, two in my upper arm . . . . Then, there's a big thick metal rod that is bolted to those—there's two metal rods. One bolted to the two lower implanted rods, two—or another rod bolted to the upper two metal implanted rods." Dkt. 127-1 at 40. Mr. Smith testified that the system sticks out six inches from his arm and that a screw holds the hinge joint together. *Id.*

At all relevant times, defendants Christopher Price, Benjamin Rilenge, and Mark Lamb were officers employed by the IDOC. Dkt. 117-2, ¶ 2 (Price affidavit); dkt. 117-3, ¶¶ 2, 4 (Lamb affidavit). Officer Price and non-party Officer Jeff Hancock[4] were assigned to transport Mr. Smith from Wabash Valley to the hospital on June 13, 2019, for a medical appointment, and then to return him to the facility. Dkt. 117-2, ¶ 4. Officers Rilenge and Lamb were assigned to transport Mr. Smith from Wabash Valley to the hospital on June 20, 2019, for a medical appointment, and then to return him to the facility. Dkt. 117-3, ¶ 4. Mr. Smith testified at his deposition that before June 13, 2019, he recalled no other interactions with Officer Price, but that as far as he knew Officer Price was only responsible for transporting inmates to and from the facility as a "trip officer." Dkt. 127-1 at 22, 30. Similarly, Mr. Smith testified that as far as he knew, Officers Rilenge and Lamb were also "just trip officers," responsible for transporting inmates to and from the facility. *Id.* at 30.

---

[4] In his response in opposition, recruited counsel acknowledges that Officer Hancock is not a party to these proceedings but contends that this officer's name was only now disclosed in defendants' memorandum of law in support of their dispositive motion and in Officer Price's affidavit and that it was not listed in the defendants' initial disclosures. Dkt. 126 at 3. In reply, defendants state that plaintiff served "no discovery on Defendants whatsoever in an effort to identify any particular individuals" and that he "has not sought leave to add an additional party nor has he sought any limitation on this basis." Dkt. 128 at 2.

As set forth in the Court's Order Setting Pretrial Schedule and Discussing Discovery in Prisoner Litigation, defendants' initial disclosures **were to provide to Mr. Smith:** "Witnesses: The names and working addresses of the persons with knowledge of the relevant incidents whom the defendants may use to support their defense, along with a short description of what each person knows." *See* dkt. 82 at 2 (issued Apr. 11, 2023). **Because defendants did not disclose Officer Hancock, they will not be permitted to call him as a witness at trial.** *See* Fed. R. Civ. P. 37(c)(1) ("If a party fails to . . . identify a witness as required by Rule 26(a), or (e), the party is not allowed to use that . . . witness to supply evidence on a motion, at a hearing, or at a trial[.]" Mr. Smith, however, is permitted to call Officer Hancock as a witness if he so chooses.

Relevant to this issue, the Court denied Mr. Smith's motion to amend his complaint by adding an unknown officer or "John Doe," in its Order of August 1, 2023. *See* dkt. 103. The Court explained that it had dismissed Mr. Smith's claims against an "unknown" individual defendant for failure to state a claim upon which relief can be granted and that any amendment to again add a John Doe defendant would be futile. *Id.* at 3. Further that Mr. Smith's request for more time to discover John Doe's identity came too late because the applicable Indiana 2-year statute of limitations has expired and tolling of the statute of limitations did not apply. *Id.* at 4-5 (discussing that timeliness requirement applies to John Doe defendants and that plaintiff had not explained what steps, if any, he took to identify John Doe "during the nearly 2 years that passed between the events and the filing of this action").

**B. June 13, 2019, Transport—Officer Price**

**1. Officer Price's Account**

Officer Price attested that in his role as a correctional officer he is "familiar with the IDOC and [Wabash Valley] offender transport policies and procedures that were in place at the times relevant." Dkt. 117-2, ¶ 3. "Policy mandated that offenders housed in segregation units be transported in high-security Briggs vans," and according to policy, "offenders were also required to be buckled into their seats at all times while the vehicle was in motion." *Id.* Mr. Smith was housed in segregation at Wabash Valley at the time of transport. Dkt. 127-1 at 11, 18-19.

On June 13, 2019, Officers Price and Hancock transported Mr. Smith from Wabash Valley to the hospital. Dkt. 117-2, ¶ 4. There was no issue with this first leg of the transport. *Id.* Officer Price attested that Mr. Smith "was placed in standard trip gear and seated in the back of a Briggs van with his seatbelt buckled." *Id.* Officer Price did not have knowledge or recollection that he or Officer Hancock threatened Mr. Smith about any grievances he filed against Wabash Valley staff or that they had any discussion with Mr. Smith about his grievances. *Id.*, ¶ 5. Officer Price attested he was unaware of Mr. Smith's grievances against several non-party officers, had no desire to retaliate against Mr. Smith, and did not recall having any interactions with him before the June 13, 2019, transport. *Id.*

On the return leg of the transport, Officer Price attested that Mr. Smith was in trip gear and was seated "on the bench located in the steel cage compartment in the back of the van." *Id.*, ¶ 6. Mr. Smith was buckled in his seatbelt, and Officer Price was assigned to periodically monitor Mr. Smith from the front passenger seat, while Officer Hancock drove the van. *Id.* Officer Price ordered Mr. Smith not to touch his seatbelt after Mr. Smith made a comment that he "might remove his seatbelt," and Officer Price did not believe further action was necessary as he "did not think

that Plaintiff genuinely intended to remove his safety belt." *Id.*, ¶ 7. Officer Price recalled that "another car suddenly pulled out in close proximity to the front of the van, creating the risk for an accident." *Id.*, ¶ 8. Officer Price recalled Officer Hancock applied the brakes but that he "did not brake excessively," and only did so to avoid an accident, but that he "drove at a safe, reasonable speed and distance from other cars at all points during this drive." *Id.*

When Officer Hancock applied the brakes, Mr. Smith "fell forward and hit the wall of the cage compartment," but Officer Price did not see the impact. *Id.*, ¶ 9. Officer Price did see Mr. Smith "laying on the floor, yelling out in pain and inferred that Plaintiff had unbuckled his seatbelt prior to the incident." *Id.* At this point, the Officers pulled over to assist Mr. Smith and to contact their supervisors. *Id.* Officer Price picked Mr. Smith up off the floor and returned him to a seated position on the beach. *Id.*, ¶ 10. He attested that at first, he was not aware that Mr. Smith had injured his upper body, and he tried to lift Mr. Smith by his shoulders. *Id.* When he realized Mr. Smith had injured his shoulder, Officer Price released Mr. Smith's arms and pulled him up from the waist chain. *Id.* Mr. Smith told the officers his shoulder was broken and requested to be taken back to the hospital. *Id.* The officers were advised to take Mr. Smith back to the emergency room before returning to Wabash Valley, which they did. *Id.*, ¶ 11. Officer Price did not recall the specific diagnosis, but he understood that Mr. Smith was treated at the hospital and released the next morning, on June 14, 2019. *Id.*

Officers Price and Hancock transported Mr. Smith back to Wabash Valley the next morning without incident. *Id.*, ¶ 12. During this transport, Mr. Smith was in trip gear, seated in the back of the van, and was buckled in his seat. *Id.* Once at Wabash Valley, Mr. Smith was evaluated by medical personnel. *Id.* Officer Price does not recall any further interactions with Mr. Smith following this final transport. *Id.*, ¶ 13.

### 2. Officer Hancock's Account

Plaintiff's exhibits include Officer Hancock's incident report that documents his version of

the events as follows:

> On 6-13-19 at approximately 4:50 p.m. C/O C. Price and I, C/O J. Hancock where transporting offender Smith, Kevin 160176 (Q307) back to Wabash Valley Correctional Facility from a medical appointment at Eskenazi hospital in Indianapolis. We were traveling south bound on White River Parkway at approximately 20 m.p.h. in vehicle #2174. We were in heavy traffic as we approached Saulcey street, a man in a light colored vehicle ran a stop sign, Partially pulling into our path from Saulcey street. I had to aggressively apply the brakes and swerve to the left to avoid colliding with the other vehicle. Vehicle 2174 is a high risk transport vehicle with a divided stainless steel interior. Offender Smith was placed in the right rear of the vehicle, where his safety belt was applied by C/O C. Price. Smith was the only occupant in the rear of the vehicle that seats four. In the process of avoiding the other vehicle, Smith slid forward approximately five feet contacting the dividing wall of the vehicle. We travelled approximately ½ a block and pulled over in a safe location. Upon evaluating Smith he indicated His Clavicle may be broken. At approximately 4:55 p.m. I notified Captain R. White of the situation. At approximately 5:00 p.m. trip coordinator Sgt. J. Bolger was notified. We were instructed to return to Eskenazi emergency room so Smith could receive medical attention if needed. At 5:10 p.m. We arrived back at Eskanazi E.R. Where we were escorted to the Marion County police holding area to await medical evaluation of offender Smith.

Dkt. 127-3 (Hancock incident report signed by both Officers) (errors in original).

### 3. Mr. Smith's Account

Mr. Smith testified that Officer Price transported him to the hospital for a pre-op vitals

check on June 13, 2019. Dkt. 127-1 at 44. He does not dispute that he was buckled in his seatbelt

and there was no issue, until he got to the hospital. *Id.* at 45. Mr. Smith testified that when Officers

Price and Hancock escorted him down the hallway for his medical appointment, that they said to

him: "Oh, yeah, you're the one that filed the grievance on Officer Foster," and they asked him why

he had done so.[5] *Id.* at 45-46. Mr. Smith thought nothing of it but admitted he had filed a grievance

---

[5] Mr. Smith filed an informal complaint in April 2019 and a formal grievance in May 2019 related to allegations that IDOC Officer Foster impeded his medical treatment for his elbow and contributed to his

and explained why. *Id.* After his appointment, he testified that the Officers told him that he "better watch out" and "better be careful and stuff" from filing grievances. *Id.* at 48.

Mr. Smith testified that the Officers put him on the bench seat and started to close the door to the van without securing his seatbelt. *Id.* at 49. When he asked to be secured, the Officers told him: "Oh. Well, you're not going anywhere, don't worry about it." *Id.* Mr. Smith explained that he was in trip gear and could not move, reach around, or independently access or buckle his own seat belt. *Id.* at 38-39 ("[T]echnically, you can't move and you can't reach around and grab that lock or play with the locking mechanism or nothing. You can't even reach up and scratch your nose or wipe your mouth if you had to . . . . No, it's impossible to reach around and grab [your seatbelt] and then reach down and do all that. There's hardly any movement.").

Mr. Smith could not see who was driving, but he could "kind of see through the window through the windshield," and he saw backed up traffic. *Id.* at 49. Mr. Smith observed "a long line of traffic" but did not think the Officers were going 15 to 20 miles per hour, despite their incident report. *Id.* at 51-52. He described that the Officers "kept like hitting the gas, kind of punching it kind of fast and then coming to a stop," but he could not hold on to anything to brace himself, when the Officers "kept kind of jerking the van back and forth." *Id.* at 50 ("I'm like, man, this driver, man, he's crazy, you know. It's just to me, not the normal way a person drives. However, some people do drive like stop and go real fast."). Mr. Smith recalled that he "went flying forward," "slammed on the ground," and was "laying on the floor in pain screaming." *Id.* Mr. Smith felt his shoulder "pop," and when the Officers pulled over and pulled him out of the van, he believed his shoulder was broken, and he had an "egg" or bump, on his forehead. *Id.* at 52-54. Mr. Smith did not see a car pull out in front of Officer Hancock. Dkt. 127-4 at 4 (plaintiff's grievances)

---

placement in segregation. *See* dkt. 127-6 (plaintiff's grievances). The Court takes judicial notice that Mr. Smith's claims against Officer Foster proceed in *Smith v. Foster et al.*, No. 1:22-cv-00404-JRS-CSW.

Mr. Smith was taken back to the hospital and treated for a broken collarbone. Dkt. 127-2 at 5-16. He testified that while he was being treated, the Officers were "sitting at the doorway . . . on their cell phones creating their report about what they were going to tell IDOC," and what they would include in their incident reports. Dkt. 127-1 at 59. Mr. Smith observed the Officers showing each other their reports and laughing, but he "couldn't hear everything they were saying." *Id.* at 60. He testified the Officers were talking about making sure that their reports were aligned with each other but that they did not "say the exact same thing because then it will look funny." *Id.* at 60-61 ("I directly overheard them making the comments, watching them use their phones, talking about, they need to do their . . . report[.]"). When the Officers returned Mr. Smith to Wabash Valley, he was buckled in and there was no other issue. *Id.* at 61.

Mr. Smith never interacted with Officer Price before the June 13, 2019, transport. *Id.* at 22. He testified that both Officers would not tell him who they were when he asked, that they hid their name badges from him, and that he only learned that Officer Price was involved by asking a staff member after the incident. *Id.* at 23, 61-62.

### C. June 20, 2019, Transport—Officers Rilenge and Lamb

#### 1. Officers Rilenge and Lamb's Account

Officer Lamb attested that in his role as a correctional officer, he is "familiar with the IDOC and [Wabash Valley] offender transport policies and procedures that were in place at the times relevant," and that policy does not allow offenders to be transported in the front seat. Dkt. 117-3, ¶ 3. On June 20, 2019, Officers Rilenge and Lamb were assigned to transport Mr. Smith from Wabash Valley to the hospital for elbow surgery. *Id.*, ¶ 4. Mr. Smith was transported in trip gear, he was secured with his seatbelt buckled on the bench in the back of the van. The transport occurred without incident. *Id.*

After surgery, Officer Lamb offered Mr. Smith snacks to eat before transport back to Wabash Valley, but Mr. Smith refused them. *Id.*, ¶ 5. Officers Rilenge and Lamb then prepared to transport Mr. Smith in trip gear and buckled him in his seatbelt in the back of the van. *Id.* Officer Lamb again offered Mr. Smith snacks, but he refused. *Id.*

Officer Lamb told Mr. Smith that he "would adjust the air conditioning in the van at [Smith's request]," but advised Mr. Smith to use a "loud voice so that [Lamb] could hear his request." *Id.*, ¶ 6. Officer Lamb never heard Mr. Smith ask him or Officer Rilenge to adjust the air conditioning at any point during the transport. *Id.* Officer Lamb attested "[t]he air conditioning was on throughout the duration of that drive." *Id.* Officer Lamb did not recall Mr. Smith complaining about being nauseous, hungry, hot, or uncomfortable during the approximately two-hour return trip to Wabash Valley. *Id.*, ¶ 8.

Officer Lamb drove the van while Officer Rilenge periodically monitored Mr. Smith from the front passenger seat. *Id.*, ¶ 7. Officer Lamb "elected to drive on the street roads due to congested traffic conditions present on the highway," but this route, required him to traverse "bumps such as railroad tracks or potholes."[6] *Id.* Officer Lamb attested there were a few bumps during the transport but that he did not believe the highway would have been "a smoother ride because the highway also included numerous potholes, construction plates, or other such obstacles." *Id.* Officer Lamb remembered Mr. Smith complaining about driving over the railroad tracks but did not recall him otherwise complaining about the quality of Officer Lamb's driving or indicating that he was in

---

[6] Mr. Smith testified that the Officers were going down I-70 and his designated evidence includes the activity detail report for the van on June 20, 2019, "which shows that vehicle primarily drove on I-70 beginning when the key was turned on in Indianapolis at 9:31:01 AM until arriving at Wabash Valley at 11:39:22 AM, which looks to be consistent with the same path taken to reach Eskenazi between 2:35:51 AM and 5:18:14 AM." Dkt. 126 at 13; dkt. 127-1 at 73-74 ("If you've ever been on I-70, there's kind of a good side, which is the fast lane on the left by meridian. And then there's a very bad side on the right-hand side that's like every maybe quarter of a mile or eighth of a mile is bump, bump, bump, and big bumps or big patches in the road, all down through I-70."); dkt. 127-5 (IDOC activity detail report).

pain. *Id.* During the return trip, Officers Rilenge and Lamb stopped at a convenience store to buy beverages, and they were in the store for less than 10 minutes while Mr. Smith was in the Briggs van. *Id.*, ¶ 9. Officer Lamb attested they "never pulled over to smoke cigarettes or take any other breaks during that drive." *Id.*

Once back at Wabash Valley, Officers Rilenge and Lamb escorted Mr. Smith to his unit, and at that time, Officer Lamb asked him "if he wanted to get his sack lunch from the unit team." *Id.*, ¶ 10. Officer Lamb attested that if Mr. Smith requested food then, "it would have been the obligation of the unit team personnel to procure those items for him, not the transporting officers." *Id.*

Officer Lamb did not recall that he or Officer Rilenge threatened or discussed Mr. Smith's grievances against Wabash Valley staff during the June 20, 2019, transport. *Id.*, ¶ 11. Officer Lamb was unaware of any grievances Mr. Smith filed against any non-parties, he never had a desire to retaliate against Mr. Smith, and did not recall having further interactions with Mr. Smith following this transport. *Id.*, ¶¶ 11-12.

### 2. Mr. Smith's Account

Mr. Smith was informed he was to be transported on June 20, 2019, to the hospital for surgery and that he was not allowed to eat after midnight the night before. Dkt. 127-1 at 68; dkt. 127-2 at 17-21. Mr. Smith was transported by Officers Rilenge and Lamb in the same Briggs-style van as his prior transport. Dkt. 127-1 at 69. Mr. Smith asked the Officers to transport him in the front of the van due to his elbow and collarbone injuries so that he would feel safe and could brace himself. *Id.* at 70. When the Officers told him no, Mr. Smith refused to be transported. *Id.* at 71. Eventually, the Officers allowed him to "sit up in the front secured area," and he was buckled in a seatbelt and arrived at the hospital without incident. *Id.*

Mr. Smith testified that officers have to sit with an inmate while at the hospital, even during surgery, and that Officers Rilenge and Lamb knew that he was given a "pain ball," or drip pain medication that the doctor told Mr. Smith would not take effect for at least an hour and half after it was administered. *Id.* at 71-72. Mr. Smith believed he vomited while at the hospital because of the anesthesia, had requested "vomit bags" from hospital staff in case he got sick again on the transport, and again requested that the Officers place him in the front of the van. *Id.* at 72. This time, he was forced to sit in the back but was buckled in his seatbelt. *Id.* at 74.

Mr. Smith testified that the van was "hot as heck," and that he asked the Officers to turn on the air conditioning or roll down the windows to circulate air because he was having hot flashes and felt nauseated from the procedure and from not eating. *Id.* He testified he was denied this request. *Id.* He testified he was in the back screaming in pain asking the Officers to stop going over bumps, but that they kept driving. *Id.* at 75. Mr. Smith recalled the Officers stopped at a gas station for about 10 or 15 minutes, leaving him in the hot van in "probably 90 degree" weather while they smoked cigarettes. *Id.* at 76. When the transport resumed, Mr. Smith again asked for air conditioning because he was receiving no air flow. *Id.* Then, the Officers went over railroad tracks, bouncing the van, while Mr. Smith was screaming in pain and the Officers were laughing. *Id.* at 76-77 ("Scream some more. This is funny."). Mr. Smith believed one of the Officers asked if they should speed up or slow down over the railroad tracks, and Mr. Smith saw the Officer in the passenger seat wave his hand as if to indicate they should go faster. *Id.* ("[T]hey speed up over these tracks and kind of catch some air and bounces and everything. And turn around, they're laughing about that. And they did that over like three sets of railroad tracks.").

Mr. Smith testified that when they got back to Wabash Valley, he asked the Officers for his breakfast and lunch sacks, but he was told this request was up to the unit staff, but the unit staff

told him to talk to the trip officers. *Id.* at 77-78, 81. Mr. Smith missed both breakfast and lunch on June 20, 2019, and his only meal that day was dinner. *Id.* at 82-83.

Mr. Smith did not specifically recall interacting with Officers Rilenge and Lamb before June 20, 2019, but he believed they may have transported him another time and denied him food. *Id.* at 87, 91. He did not recall Officers Rilenge or Lamb making comments about any of his grievances during the transport. *Id.* at 88-89 ("No, they kind of remained silent about the situation. I mean, I'm sure—although I can't prove, I'm sure they are aware of the whole entire chain of events that happened to me prior."). Mr. Smith did not recall interacting with the Officers after this transport. *Id.* at 94-95.

To date, Mr. Smith testified he experiences extreme pain related to the initial transport, that the incident created problems in rehabilitation of his elbow, and that he struggles with anxiety, depression, and suicidal ideation because of the continuing pain. *Id.* at 95-96. He is waiting to see a spine specialist, and he still has pain in his elbow from the surgery but does not necessarily associate it with the injuries from the June 13, 2019, transport. *Id.*

### III.
### Discussion

Defendants argue that they are entitled to summary judgment because 1) they are entitled to qualified immunity on Mr. Smith's Eighth Amendment claims; 2) they did not violate Mr. Smith's Eighth Amendment rights; and 3) they did not violate Mr. Smith's First Amendment rights. Dkt. 118.

### A. Eighth Amendment Claims and Qualified Immunity

#### 1. Eighth Amendment

The Eighth Amendment's proscription against cruel and unusual punishment protects prisoners from the "unnecessary and wanton infliction of pain" by the state. *Hudson v. McMillian*,

13

503 U.S. 1, 5 (1992) (citation and internal quotations omitted). Pursuant to the Eighth Amendment, prison officials have the duty to provide humane conditions of confinement: "prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (internal quotation omitted). To succeed on a conditions-of-confinement claim under the Eighth Amendment, a plaintiff must show that 1) he was incarcerated under conditions that posed a substantial risk of objectively serious harm, and 2) the defendants were deliberately indifferent to that risk, meaning they were aware of it but ignored it or failed "to take reasonable measures to abate it." *Townsend v. Cooper*, 759 F.3d 678, 687 (7th Cir. 2014); *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014); *Townsend v. Fuchs*, 522 F.3d 765, 773 (7th Cir. 2008) (citing cases).

To satisfy an Eighth Amendment conditions-of-confinement claim, a plaintiff must establish an objective and subjective component. *Giles v. Godinez*, 914 F.3d 1040, 1051 (7th Cir. 2019). The objective showing means "that the conditions are sufficiently serious—i.e., that they deny the inmate the minimal civilized measures of life's necessities, creating an excessive risk to the inmate's health and safety." *Id.* (internal quotation omitted). "According to the Supreme Court, . . . 'extreme deprivations are required to make out a conditions-of-confinement claim.'" *Id.* (quoting *Hudson*, 503 U.S. at 9). "If under contemporary standards the conditions cannot be said to be cruel and unusual, then they are not unconstitutional, and [t]o the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." *Id.* (internal quotation omitted). After showing the objective component, a plaintiff must next establish a "subjective showing of a defendant's culpable state of mind," and "the state of mind necessary to establish liability is deliberate indifference to the inmate's health or

safety." *Id.* (internal quotation omitted). Thus, negligence or even gross negligence cannot by itself support a § 1983 claim. *See Huber v. Anderson*, 909 F.3d 201, 208 (7th Cir. 2018).

### 2. Qualified Immunity

"Qualified immunity 'protects government officials from liability for civil damages when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Taylor v. City of Milford*, 10 F.4th 800, 806 (7th Cir. 2021) (quoting *McAllister v. Price*, 615 F.3d 877, 881 (7th Cir. 2010)). To overcome an assertion of qualified immunity, a plaintiff must show that "(1) the defendant violated a constitutional right, and (2) that [the] right was clearly established at the time of the alleged violation." *Sinn v. Lemmon*, 911 F.3d 412, 418 (7th Cir. 2018). In other words, qualified immunity is appropriate when the clearly established law, as applied to the facts, "would have left objectively reasonable officials in a state of uncertainty." *Horshaw v. Casper*, 910 F.3d 1027, 1030 (7th Cir. 2018); *see also Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (district court may bypass question of whether constitutional violation occurred and address the "clearly established" prong first.).

"For the law to be clearly established, the 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Lopez v. Sheriff of Cook Cty.*, 993 F.3d 981, 987 (7th Cir. 2021) (quoting *Ashcroft v. al-Kidd,* 563 U.S. 731, 741 (2011)). Determining whether a state actor violates clearly established law requires a look at past cases with specificity. *Id.* at 988. "The Supreme Court has time and again instructed lower courts 'not to define clearly established law at a high level of generality.'" *Id.* (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)). A violation is only "clearly established where: (1) a closely analogous case establishes that the conduct is unconstitutional; or (2) the violation is so obvious that a reasonable state actor would know that

his actions violate the Constitution." *Siebert v. Severino*, 265 F.3d 648, 654-55 (7th Cir. 2001). In *Plumhoff v. Rickard*, the United States Supreme Court held that a "defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." 572 U.S. 765, 778-79 (2014).

It's Mr. Smith's burden to demonstrate a violation of a clearly established right. *Hernandez ex rel. Hernandez v. Foster*, 657 F.3d 463, 473 (7th Cir. 2011). In establishing that the right that was violated was clearly established at the time, Mr. Smith need not rely on a case directly on point, but "existing precedent must have placed the statutory or constitutional question beyond debate." *Stanton v. Sims*, 571 U.S. 3, 6 (2013) (per curiam).

### 3. Officer Price and the Seatbelt

Defendants argue that Officer Price's "only alleged transgression was his failure to secure Plaintiff's seatbelt," and that Mr. Smith "does not allege that Defendant Price did anything to imperil Plaintiff during their drive back to the facility." Dkt. 118 at 11, 13. The Court agrees. It is undisputed that Officer Price was not driving on the return leg of the June 13, 2019, transport, and Officer Hancock, the driver, is not a party to this action. Therefore, the only conduct that the Court need address is Officer Price's conduct. *See, e.g., Colbert v. City of Chi.*, 851 F.3d 649, 657 (7th Cir. 2017) ("Individual liability under § 1983 requires personal involvement in the alleged constitutional deprivation.") (cleaned up). There is a factual dispute over whether Mr. Smith was buckled in his seatbelt during the relevant time, and for summary judgment, the Court assumes he was not. Defendants argue that Officer Price is entitled to qualified immunity because inmates do not have a clearly established right to be secured with a seatbelt during transports. Dkt. 118 at 10 (citing *Dale v. Agresta*, 771 F. App'x 659, 660-61 (7th Cir. 2019)).

16

In *Agresta*, decided on June 4, 2019, the Seventh Circuit affirmed the district court's finding that the defendant was entitled to qualified immunity because the plaintiff "did not have a clearly established right to a seatbelt." 771 F. App'x at 660-61. "True, the Eighth Amendment protects inmates from prison officials knowing of and disregarding excessive risks of future harm . . . . But that principle is too general to defeat qualified immunity . . . . Neither the Supreme Court nor this court has ruled that transporting an inmate without a seatbelt creates an intolerable risk of harm.[7] Indeed, when an arrestee who was unbuckled and escaped from the back seat of a squad car caused the accident that led to his death, we concluded that the failure to seatbelt him was, at most, negligent." *Id.* (internal citations omitted). The Seventh Circuit then noted that "without reckless driving or other exacerbating circumstances, failing to seat-belt a shackled inmate does not pose a substantial risk of serious harm," and that the plaintiff "lacks evidence that Agresta did anything to increase the risk of harm beyond transporting him in a van without seatbelts." *Id.*

Mr. Smith argues that defendants reliance on *Agresta* and *Thompson* (nonprecedential cases),"paints with too broad a brush when applied to the facts of this case," and that "prior to June 13, 2019, it was clearly established that exposing an inmate to dangerous conditions in transportation through failing to restrain him with a seatbelt accompanied by other conditions such as rebuffing his specific request to be restrained, engaging in reckless driving, and otherwise acting

---

[7] Similarly, in *Thompson v. Bukowski*, No. 21-2814, 2023 WL 154962 (7th Cir. 2023), the Seventh Circuit affirmed the district court's finding of qualified immunity regarding the conditions of the plaintiff's transport that he did not have a clearly established right to a seatbelt. *Id.* at *3 ("Neither the Supreme Court nor this court has ruled that transporting an inmate without a seatbelt creates an intolerable risk of harm . . . . We also agree that Thompson has not identified any evidence that would persuade a reasonable jury that his complaints about the other conditions of transport (e.g., the shackling or the sideways-facing steel benches) denied him 'the minimal civilized measures of life's necessities.'").

In *Thompson*, plaintiff was transported multiple times in vans with no seatbelts and argued that he experienced anal bleeding caused by his hemorrhoid condition after those transports and feared he would be injured in an accident because of the awkward seating angle, his inability to see outside, and the lack of airbags and seatbelts. *Id.* at *1.

intentionally violates the Eighth Amendment." Dkt. 126 at 1, 15. Mr. Smith asks the Court, "in the absence of controlling Supreme Court or Seventh Circuit precedent," to "cast a wider net and look to whether 'all relevant case law' demonstrates 'such a clear trend . . . that we can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time.'" *Id.* at 19 (quoting *Werner v. Wall*, 836 F.3d 751, 762 (7th Cir. 2016)).

Defendants point out that Mr. Smith then cites "over a dozen, nonprecedential cases from various jurisdictions." Dkt. 128 at 3. Defendants argue that the constitutional right to a seatbelt is "not beyond debate," that "[i]t was not sufficiently clear that Defendant Price could have reasonably understood he was violating any of Plaintiff's rights during the transport," and that "Plaintiff simply cannot demonstrate a clearly established right to a seatbelt during transport that includes repeated starting and stopping due to heavy traffic." *Id.* at 4. The Court agrees.

Once qualified immunity is raised, it is Mr. Smith's burden to demonstrate that he was entitled to a seatbelt on the transport, and he has not met this burden by pointing to any authority in the Supreme Court or the Seventh Circuit that establishes he was entitled to a seatbelt during the June 13, 2019, transport. Accordingly, Officer Price is entitled to qualified immunity as to the Eighth Amendment claim against him.

### 4. Officers Rilenge and Lamb

Defendants argue that "the myriad of conditions during Plaintiff's second trip to the hospital—traversing bumps on the road, minimal heat in the transport vehicle, and Defendants' refusal to produce meals during the trip—do not implicate any clearly established rights," and as such, Officers Rilenge and Lamb are entitled to qualified immunity.[8] Dkt. 118 at 11. Defendants

---

[8] Mr. Smith contends that the defendants waived their qualified immunity arguments as to Officers Rilenge and Lamb because they "provide only a single sentence without citation to authority." Dkt. 126 at 23. Defendants reply that this is a mischaracterization of their argument as shown in the multiple paragraphs preceding the "single sentence," which argue that "without a clearly established constitutional right, there

also argue that Officers Rilenge and Lamb did not violate Mr, Smith's Eighth Amendment rights on this transport. *Id.* at 11-17.

### a. Driving

While Mr. Smith argues that "the use of a vehicular transport to subject an inmate to a 'rough ride' was a clearly established Eighth Amendment violation prior to June 20, 2019," he points only to cases from other circuit courts. Dkt. 126 at 24 (citing *Scott v. Becher*,[9] 736 F. App'x 130 (6th Cir. 2018)). Mr. Smith acknowledges that the Seventh Circuit has not specifically addressed "rough rides," but that in *Scott*, decided in 2018, the Sixth Circuit reasoned that there is "a clear consensus among the circuits," that "'the Eighth Amendment protect[s] against the malicious and sadistic infliction of pain and suffering . . . in a diverse range of factual scenarios'" including using a vehicle to maliciously harm an inmate. *Id.* (quoting *Scott*, 736 F. App'x at 133-34 and *Thompson v. Virginia*, 878 F.3d 89, 103, 105 (4th Cir. 2017)).

---

can be no violation of Plaintiff's rights and the legal citations and reasoning in support of Defendant Price are also the legal citations and reasoning in support of Defendants Lamb and Rilenge," and that once qualified immunity is raised, it is plaintiff's burden to show defendants are not entitled to qualified immunity. Dkt. 128 at 5. The Court finds that defendants **did not waive their arguments as to qualified immunity** and will address it in the context of the "rough ride" Mr. Smith alleges he was exposed to on his return from the hospital to Wabash Valley on June 20, 2019.

The Court will also address Mr. Smith's allegations about the air conditioning and lack of food on the merits.

[9] In *Scott*, plaintiff filed a complaint alleging that a correctional officer's reckless driving caused him injury in violation of the Eighth Amendment, and the district court granted the officer's motion to dismiss on the basis of qualified immunity. 736 F. App'x at 132. The Sixth Circuit concluded that the officer was not entitled to qualified immunity at that stage. *Id.* at 133 ("Becher was driving above the speed limit, swerving, and generally driving recklessly. When Scott and other inmates "beg[ged] him to slow down, before [they] all die[d], Becher refused, laughed, and instead accelerated. At some point, the speeding bus hit a bump, sending the front tires of the bus airborne. The inmates went airborne, too. One would assume that all the prisoners were handcuffed then, but apparently none were seat-belted. As a result, Scott was catapulted out of his seat, and was then slammed down onto his head, neck, and back. When the bus tires landed, the front tire of the bus went off the road, and in an apparent overcorrection, Becher swerved the bus into the lane of oncoming traffic before regaining control.").

Mr. Smith has not met his burden to overcome qualified immunity by pointing to any authority in the Supreme Court or the Seventh Circuit that establishes he was entitled to be free from experiencing a "rough ride," during the June 20, 2019, transport. Even considering *Scott*, the factual circumstances of that transport were different in that it is undisputed that Mr. Smith was buckled in his seat, that no accident occurred, and that Mr. Smith did not suffer any documented injuries as result of the rough ride. Though Mr. Smith may have experienced some pain after his surgical procedure and before his pain medication took effect, and even taking his testimony as true that the Officers were unprofessional and laughed at his discomfort, those factors do not overcome qualified immunity.

Accordingly, Officers Rilenge and Lamb are entitled to qualified immunity as to the Eighth Amendment claims related to their driving during the June 20, 2019, transport.

### b. Lack of Air Conditioning

Mr. Smith's claims about lack of air conditioning in the van on June 20, 2019, cannot survive summary judgment. Extreme temperatures may violate the Eighth Amendment, depending on the severity and duration. *Dixon v. Godinez*, 114 F.3d 640, 644 (7th Cir. 1997). But, Mr. Smith has not designated evidence that he was exposed to severe heat for a prolonged duration such that a reasonable juror could find that a constitutional violation occurred here; at maximum Mr. Smith was exposed to uncomfortable temperatures in the summer heat for around two-hours. *See, e.g.*, *Wheeler v. Godinez*, No. 13-CV-964-NJR-RJD, 2016 WL 5394385, at *4 (S.D. Ill. Sept. 27, 2016) ("The Supreme Court and the Seventh Circuit have not yet held, however, that prisoners are entitled to air conditioned cells." Plaintiff was exposed to cellhouse temperature of 80 degrees, ninety percent of the time, and "[w]hile undoubtedly warm and uncomfortable, the conditions were not so hot as to be unconstitutional."); *see also Chandler v. Crosby*, 379 F.3d 1278, 1295 (11th Cir.

2004) (citing cases and concluding that a ventilation system that allowed summer temperatures to average eighty-five or eighty-six degrees during the day and eighty degrees at night was not sufficiently extreme to violate the Eighth Amendment where such temperatures were expected and tolerated by the public in Florida).

Accordingly, Officers Rilenge and Lamb are entitled to summary judgment on the Eighth Amendment claims against them related to air conditioning.

### c. Denial of Food

Mr. Smith's denial of food claims also cannot survive summary judgment. "Without question, not all conditions are sufficiently serious to implicate the Eighth Amendment, and just a few withheld meals would not contravene the constitution." *Harris v. Allen*, No. 10-cv-0596-MJR-SCW, 2013 WL 1689280, at *4 (S.D. Ill. Apr. 18, 2013) (citing *Reed v. McBride*, 178 F.3d 849, 853 (7th Cir. 1999)). The denial of food can rise to the level of a constitutional violation, however, depending on the severity of the food deprivation. *See, e.g.*, *Atkins v. City of Chi.*, 631 F.3d 823, 830 (7th Cir. 2011) ("Depriving a person of food for four days would impose a constitutionally significant hardship."); *Foster v. Runnels*, 554 F.3d 807, 812-13 (9th Cir. 2009) (concluding that denial of 16 meals in 23 days was sufficient to support a claim of deliberate indifference). The Court must assess the amount and duration of the deprivation to make this determination. *Harris*, 2013 WL 1689280, at *4 (Harris court found that the plaintiff submitted enough evidence to survive summary judgment on his claim of inadequate food when he presented admissible evidence that he was denied a lunch two or three times a week for about three months).

It is undisputed that Mr. Smith could not eat food before his surgical procedure on June 20, 2019, and as such, it is reasonable that he was not provided with breakfast or lunch during the first leg of the transport. Mr. Smith does not directly dispute that the Officers offered him snacks at the

hospital or on the return transport that day. Nor does he dispute he received dinner that evening after he returned to Wabash Valley. Any confusion as to which facility staff was responsible for providing him breakfast or lunch when he returned—either the trip officers or the unit staff—does not amount to a constitutional violation. Accordingly, Officers Rilenge and Lamb are entitled to summary judgment on the Eighth Amendment claims related to denial of food.

### B. First Amendment Claims

Mr. Smith argues that defendants retaliated against him for filing grievances against Wabash Valley staff, and in particular, Officer Foster, a non-party to this action. "To prevail on a First Amendment retaliation claim, a plaintiff must establish three elements. First, he must show he engaged in protective First Amendment activity. Second, he must show an adverse action was taken against him. Third, he must show his protected conduct was at least a motivating factor of the adverse action." *Holleman v. Zatecky*, 951 F.3d 873, 878 (7th Cir. 2020) (citing *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009)). At summary judgment, the burden of proof on whether the protected activity was a motivating factor for the alleged retaliation "is split between the parties." *Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012). Initially, a plaintiff "must produce evidence that his speech was at least a motivating factor . . . of the [] decision to take retaliatory action against him." *Id.* The burden then shifts to the defendant "to rebut the causal inference raised by the plaintiff's evidence." *Id.* If the defendant rebuts the causal inference by demonstrating a legitimate reason for the alleged retaliatory action, "the plaintiff must present evidence that the defendant's proffered explanation is pretextual." *Lalvani v. Cook Cnty., Ill.*, 269 F.3d 785, 790 (7th Cir. 2001).

Defendants do not dispute that Mr. Smith's use of the grievance process is an activity protected by the First Amendment. "'A prisoner has a First Amendment right to make grievances

about conditions of confinement.'" *Douglas v. Reeves*, 954 F.3d 643, 646 (7th Cir. 2020) (quoting *Watkins v. Kasper*, 599 F.3d 791, 798 (7th Cir. 2010)).

### 1. Officer Price

First, defendants argue that Officer Price's "failing to fasten Plaintiff's seatbelt is not a deprivation likely to deter future First Amendment activity," and point to *Agresta* for the premise that "leaving an inmate's safety belt unbuckled, without more, does not seriously jeopardize inmate safety." Dkt. 118 at 18. Further, defendants argue that "other than the safety risk imposed, Defendants are unaware of any other conceivable deterrent effect of an inmate being transported without a seatbelt." *Id.*

An adverse action for First Amendment retaliation must "be sufficiently clear and emphatic to deter a person of 'ordinary firmness' from submitting such petitions in the future." *Hughes v. Scott*, 816 F.3d 955, 956 (7th Cir. 2016). This is an objective standard, but it must be applied with the prison setting in mind. *Holleman*, 951 F.3d at 880 ("[T]he harsh realities of a prison environment affect our consideration of what actions are sufficiently adverse."). The parties have different versions of what occurred with Mr. Smith's seatbelt on the return trip on June 13, 2019. But considering the evidence in the light most favorable to Mr. Smith, he testified that he asked to be secured with his seatbelt and that Officer Price refused his request on this single trip, that he could not fasten his seatbelt himself, and that it was impossible for him to remove it. Mr. Smith testified that the seatbelt issue occurred after Officers Price and Hancock made direct comments to him about his grievances against Officer Foster and told him that he should watch out. The record also establishes that Mr. Smith was injured[10] on this transport and his testimony indicates

---

[10] "Defendants concede that causing an inmate to suffer physical harm in retaliation would likely discourage the average inmate from exercising their First Amendment rights. However, Plaintiff's nonuse of the safety belt was not the sole and direct cause [of] Plaintiff's injuries." Dkt. 118 at 18.

that he was apprehensive about his future vehicle transports and how he was to be secured in the van—for example, asking to ride in front during the transport on June 20, 2019, or refusing to be transported all together. Reasonable jurors could disagree as to whether the failure to seatbelt an inmate is an adverse action likely to deter First Amendment activity. Accordingly, this is a material fact in dispute precluding summary judgment.

Second, defendants argue that Mr. Smith's "grievances were not a motivating factor in Defendants' actions," because Mr. Smith did not identify which officer made the alleged statements about his grievances or warned him to watch out, and there is "no clear evidence linking a retaliatory motive to Defendant Price rather than Officer Hancock." Dkt. 118 at 19. But, Mr. Smith has designated evidence that he filed an informal complaint and formal grievance against Officer Foster in April and May 2019, events that happened before the June 13, 2019, transport with Officer Price. Dkt. 127-6. Mr. Smith's testimony was that both Officers Price and Hancock made comments to him at the hospital about these grievances. Dkt. 127-1 at 46 ("And as we was walking, they was like, 'Oh yeah, you're the one that filed the grievance on Officer Foster.'" And later, when Mr. Smith admitted he had, "they was like, 'Oh. Well, what happened[.]'"), 48 ("And down the hallway, they was like, oh, well, you filing that grievance and stuff, you better watch out. You better be careful and stuff."). Though Officer Price attests that he was unaware of Mr. Smith's grievances and did not retaliate against him, dkt. 117-2, ¶ 5, the Court cannot resolve this material factual dispute on summary judgment.

Accordingly, defendants' motion for summary judgment is **DENIED as to the First Amendment claim against Officer Price.** This claim will be resolved via settlement or trial.

### 2. Officers Rilenge and Lamb

Finally, defendants argue there is no evidence Officers Rilenge and Lamb were aware of Mr. Smith's grievances against Officer Foster or Wabash Valley staff, and that they never discussed Mr. Smith's grievances with him during the June 20, 2019, transport. Dkt. 118 at 19-20. The Court agrees. *See* dkt. 127-1 at 88-92. Mr. Smith testified that Officers Rilenge and Lamb did not make direct comments related to his grievances like Officer Price, and that he "can't prove" but was "sure they are aware of the entire chain of events" because they "all work in the same office" and know what is going on. *Id.* Mr. Smith stated he did not have a specific reason to believe Officers Rilenge and Lamb knew about his grievances, but simply suspected they did. *Id.* at 93 ("They knew. And Wabash is one of the worst prisons that I've been dealing with, what we call the blue wall. These staff all work in concert, work with each other, talk to each other and everything else.").

In the absence of any evidence, Mr. Smith has not demonstrated that his grievances were a motivating factor in the conditions of his transport. "The 'motivating factor' amounts to a causal link between the activity and the unlawful retaliation." *Manuel v. Nalley*, 966 F.3d 678, 680 (7th Cir. 2020). A plaintiff may meet his burden on the issue by offering "[c]ircumstantial evidence [including] suspicious timing, ambiguous statements, behavior, or comments directed at other[s] . . . in the protected group." *Id.* But, "inferences supported by only speculation or conjecture will not defeat a summary judgment motion*." Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007); *Stagman v. Ryan*, 176 F.3d 986, 999-1000 (7th Cir. 1999) ("Allegedly protected speech cannot be proven to motivate retaliation, if there is no evidence that defendants knew of the protected speech."). Accordingly, no reasonable juror could conclude that Mr. Smith can meet the third element of his prima facie case on a retaliation claim against Officers Rilenge and Lamb. They are entitled to summary judgment on the First Amendment retaliation claim.

**IV.**
**Conclusion**

For the reasons explained above, defendants' motion for summary judgment, dkt. [116], is

**DENIED with respect to the First Amendment retaliation claim against Officer Price only**,

and otherwise **GRANTED** as to all other claims and defendants.

> **The clerk is directed to terminate** Officers Rilenge and Lamb as defendants on the

docket.

> The Court requests the Magistrate Judge to confer with the parties about the possibility of

an agreed resolution.

> **IT IS SO ORDERED.**


Date: 1/25/2024

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana


Distribution:

KEVIN SMITH
160176
NEW CASTLE – CF
NEW CASTLE CORRECTIONAL FACILITY – Inmate Mail/Parcels
1000 Van Nuys Road
P.O. Box E
NEW CASTLE, IN 47362

All Electronically Registered Counsel

Magistrate Judge Wildeman